IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RUTH SELL, | ) | Case No. 5:21-cv-00007 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Ruth Sell, seeks judicial review of the final decision of the Commissioner of

Social Security, denying her application for disability insurance benefits ("DIB") under Title II

of the Social Security Act.  Sell challenges as a violation of the principle of separation of powers

the structure of the Social Security Administration ("SSA"), because, under 42 U.S.C.

§ 902(a)(3), the Commissioner does not serve at the will of the president.  Sell additionally

contests the Administrative Law Judge's ("ALJ") negative findings.  Sell argues that: (i) the ALJ

failed to adequately explain her findings at Step Three of the sequential evaluation process;

(ii) the ALJ misevaluated the opinion evidence and Sell's subjective pain symptoms; and (iii) the

ALJ's determination of Sell's residual functional capacity ("RFC") was not supported by

substantial evidence.  Sell lacks standing to contest the constitutionality of the ALJ's decision

based on the president's removal authority.  Sell has not established a basis for remand on her

Step Three challenge or on the ALJ's evaluation of the opinion evidence.  But because the ALJ

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

failed to apply proper legal standards by not adequately considering Sell's nonsevere mental health impairments at Step Four, I recommend that the Commissioner's final decision denying Sell's application for DIB be vacated and that Sell's case be remanded for further consideration.

## I.    Procedural History

On September 5, 2018, Sell applied for DIB.  (Tr. 187).[2]  Sell alleged that she became disabled on December 15, 2017, due to: "1. High Cholesterol; 2. Depression; 3. Anxiety; 4. Arthritis; 5. Degenerative Disc Disease; [and] 6. Bulging Disc in Back."  (Tr. 187, 209).  The SSA denied Sell's application initially and upon reconsideration.  (Tr. 78-90, 92-104).  She requested an administrative hearing.  (Tr. 124).

ALJ Susan Smoot held a hearing on February 6, 2020 and denied the claim in a March 19, 2020 decision.  (Tr. 10-17, 42-76).  At Step Three of the sequential evaluation process, the ALJ found that Sell did not have an impairment or combination of impairments that met or equaled Listings 1.04 (disorders of the spine), 12.04 (depressive and related disorders), and 12.06 (anxiety).  (Tr. 14).  At Step Four, the ALJ determined that Sell had the RFC to perform light work, except she "can frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds.  [Sell] can frequently stoop, kneel, crouch, and crawl."  *Id.*

Based on vocational expert testimony that someone with Sell's age, experience, and RFC could perform her past work as a vending attendant, the ALJ determined that Sell wasn't disabled and denied her application.  (Tr. 16).  On November 5, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On January 5, 2021, Sell filed a complaint to obtain judicial review.  ECF Doc. 1.

---

[2] The administrative transcript appears in ECF Doc. 13.

II.     **Evidence**

    A.     **Personal, Educational, and Vocational Evidence**

Sell was born on January 23, 1960 and was 57 years old on the alleged onset date.  (Tr. 78, 187).  Sell graduated from high school in 1978 and had specialized training as a nurse's aide.  (Tr. 210).  She had prior work as a vending attendant.  (Tr. 211).

    B.     **Relevant Medical Evidence**

Around the time of the alleged onset date, Sell had a history of anxiety, arthritis in her hands and toes, colon cancer, chronic prescription benzodiazepine use, degenerative disc disease, familial hypercholesterolemia, insomnia, low back pain, and mixed hyperlipidemia.  *See* (Tr. 265-67, 269, 278, 280-83, 314-21, 323, 456-57).  The few available physical examination results through February 26, 2018, however, were largely unremarkable.  *See* (Tr. 266, 276 280, 319, 326-27).  Her mental health impairments were noted to be in "stable" condition as of June 20, 2017 and were treated with citalopram and Xanax.  (Tr. 269, 278, 280, 317, 320, 323, 328-31).

On June 20, 2018, Sell presented to Bradley Crombie, MD, reporting pain in her lower back and left shoulder that was worsened by lifting and standing.  (Tr. 271).  However, she rated the pain as "0."  *Id.*  She also reported high anxiety because she was out of work.  *Id.*  Sell had unremarkable physical examination results.  (Tr. 273).  Dr. Crombie diagnosed Sell with arthritis, anxiety, low back pain, insomnia, and being overweight (BMI of 26.80).  *Id.* Dr. Crombie did not prescribe treatment for Sell's arthritis and back pain, noting that both conditions were "stable."  *Id.*  Dr. Crombie continued Sell's citalopram.  *Id.*

On May 30, 2019, Sell visited gastroenterologist William Shaheen, MD.  (Tr. 360).  Sell had unremarkable physical examination results.  (Tr. 360).  Dr. Shaheen ordered a colonoscopy,

which Sell underwent that same day.  (Tr. 360, 363-71).  The results of the colonoscopy showed: (i) sessile serrated polyp; (ii) unremarkable colonic mucosa; and (iii) no dysplasia.  (Tr. 372).

The next day, Sell visited Cynthia J. Koelker, MD, to establish care.  (Tr. 413).  Sell reported that she had constant back pain from a bulging disc and degenerative disc disease.  *Id.* Her pain worsened with prolonged standing, sitting, and activity, though it was "currently not too bad."  (Tr. 414).  She had been offered surgical intervention, but she had declined and instead treated her back pain with Aleve or a heating pad.  *Id.*  Sell reported a history of anxiety, depression, and panic attacks, including one suicide attempt, but was "currently stable on meds." *Id.*  She also reported trouble sleeping, which she treated with Xanax.  *Id.*  Upon examination, Sell had unremarkable results except abnormal right tympanic membrane, decreased hearing, and diminished back range of motion (50% forward flexion and 75% lateral flexion, rotation, and extension).  (Tr. 416).  Dr. Koelker diagnosed Sell with hyperlipidemia, hyperglycemia, anxiety with depression, chronic insomnia, history of colon cancer, hearing loss, and recurrent low back pain.  (Tr. 416-17).  Dr. Koelker continued citalopram and Xanax, noting that Sell's anxiety and insomnia was stable on current medication, and continued Aleve and heating pad as need for Sell's back pain.  (Tr. 417).

On July 29, 2019, Sell returned to Dr. Koelker for a follow-up.  (Tr. 404).  Sell reported off and on abdominal pain, hearing loss, and negative colonoscopy results.  (Tr. 404-05).  Upon examination, Sell had unremarkable results except difficulty hearing and abdominal tenderness. (Tr. 406-07).  Dr. Koelker prescribed trazodone to wean Sell off of Xanax for treatment of insomnia.  (Tr. 407).

On August 13, 2019, Sell visited Dr. Koelker to review ultrasound results and discuss her back issues.  (Tr. 395).  Sell reported less abdominal discomfort but had all day back pain that

radiated to her right hip.  (Tr. 396-97).  She reported trouble lifting 10-15 lb. and frequently changed position due to pain.  (Tr. 395-96).  She did not want surgical intervention.  (Tr. 397). Sell also reported that trazodone made her loopy and that she needed Xanax.  (Tr. 396).  Upon examination, Sell had unremarkable results except slow gait, non-tender back, and diminished range of motion (60° flexion, 5° extension, 75% lateral rotation and flexion, and "90% to right and no pain").  (Tr. 398).  Dr. Koelker diagnosed Sell with abdominal pain, chronic low back pain with right-sided sciatica, and chronic insomnia.  *Id.*  Dr. Koelker prescribed over-the-counter medication for Sell's abdominal pain, ordered an MRI, and switched Sell's insomnia medication to Flexeril.  *Id.*

On September 12, 2019, Sell returned to Dr. Koelker, reporting that she did not like Flexeril because it was not helping much, and it was making her drowsy in the morning.  (Tr. 387-88).  She also reported having gone to physical therapy.  (Tr. 388).  Upon examination, Sell had unremarkable results except that she got up from a chair slowly from back pain.  (Tr. 389-90).  Dr. Koelker continued Sell's anxiety medication and continued Xanax.  (Tr. 390).

On November 1, 2019, Sell visited Dr. Koelker, stating that she had gone to physical therapy for her back pain eight times, but it had not helped.  (Tr. 378).  She stated that her arthritis was bothered by the cold buy she "just deals with it – does not want medicine."  (Tr. 378-79).  She denied depression and stated her anxiety was doing well with citalopram.  (Tr. 379).  Upon examination, Sell had unremarkable results except mild hearing loss and diminished back range of motion (45° flexion, 5° extension, pain when leaning left, and nearly full rotation). (Tr. 380-81).  Dr. Koelker diagnosed Sell with bulging of lumbar intervertebral disc, chronic insomnia, anxiety with depression, hyperlipidemia, and right-ear hearing loss.  (Tr. 381).

Dr. Koelker referred Sell to pain management and discussed surgical intervention, which Sell declined.  *Id.*  Dr. Koelker increased Sell's Xanax for her insomnia and continue citalopram.  *Id.*

On November 19, 2019, Sell visited Katherine Guran, MD, as a new patient.  (Tr. 433).  Sell reported low back pain rated at 5/10 that was worsened by prolonged sitting, standing, and lifting, for which she got no relief from physical therapy.  *Id.*  Upon examination, Sell had unremarkable results except pain with extension and facet loading, right greater than left.  (Tr. 435).  Dr. Guran diagnosed Sell with chronic low back pain without sciatica and spinal stenosis without neurogenic claudication.  (Tr. 436).  Dr. Guran ordered an MRI and x-rays of Sell's back, prescribed diclofenac, and stated that Sell's anxiety and depression conditions were "stable."  *Id.*  Sell underwent x-ray testing the same day, the results of which showed: (i) degenerative disc disease at L5/S1; (ii) degenerative facet disease in the lower lumbar spine; and (iii) mild levoscoliosis.  (Tr. 446).

On December 10, 2019, Sell underwent an MRI scan of her spine, which showed: (i) mild degenerative changes in the lumbar spine with no lumbar spinal canal or neural foraminal stenosis; and (ii) interspinous bursitis at L3-L5 which may be the cause Sell's back pain.  (Tr. 443).

### C.  Relevant Opinion Evidence

#### 1.  Physical Impairments

##### a.  Consultative Examiner – Mark Vogelgesang, MD

On November 12, 2018, Mark, Vogelgesang, MD, issued a report of his physical examination of Sell.  (Tr. 294-302).  Sell reported hand pain rated at 4/10 that began a month earlier with occasional numbness in the right hand.  (Tr. 295).  She also reported low back pain rated at 7/10 with no radiation.  *Id.*  Sell stated that she could sit for an hour before having to

shift positions due to her back, she could stand for up to two hours, she could walk a mile and drive, and she could carry/lift 25 lb.  *Id.*  Sell further reported that she was able to dress, cook, clean, and go to the bathroom.  (Tr. 296).  Sell underwent x-ray examination in connection with the evaluation, which showed moderate degenerative changes.  (Tr. 293).

Upon physical examination, Sell had unremarkable results, except decreased flexion of about 70°.  (Tr. 296-97, 299-302).  Dr. Vogelgesang opined that Sell could perform work at the light-to-sedentary exertional levels, noting that Sell would have to avoid "extensive bending or twisting and possibly repetitive actions with her hands."  (Tr. 297).

### b.      State Agency Consultants

On November 28, 2018, Gerald Klyop, MD, evaluated Sell's physical capacity based on a review of the medical record, determining that she could perform medium work.  (Tr. 86-89).  Specifically, Dr. Klyop found that Sell could: (i) lift 50 pounds occasionally and 25 pounds frequently, with commensurate lifting and carrying restrictions; (ii) stand/walk/sit 6 hours in an 8-hour workday; (iii) frequently stoop, kneel, crouch, and crawl; (iv) occasionally climb ladders/ropes/scaffolds; and (v) climb ramps/stairs and balance without limitation.  (Tr. 86-88).  On February 3, 2019, Abraham Mikalov, MD, concurred with Dr. Klyop's assessment.  (Tr. 100-03).

### 2.      Mental Impairments

### a.      Consultative Examiner – Sudhir Dubey, PsyD

On November 14, 2018, Sudhir Dubey, PsyD, conducted consultative examination related to Sell's mental capacity.  (Tr. 304-10).  Sell reported being depressed since the 1990s with symptoms of panic and anxiety once per week.  (Tr. 305).  On a daily basis, Sell stated she was able to wash, shower, dress, shop, manage money, care for pets, manage medication,

manage a schedule, complete basic paperwork, and paint.  (Tr. 306-07).  On mental status examination, Sell had a below-average level of cognitive functioning but otherwise unremarkable observations.  (Tr. 307-08).

Dr. Dubey diagnosed Sell with alcohol use disorder, moderate in sustained remission, and depressive disorder, not otherwise specified.  (Tr. 308).  Dr. Dubey opined that Sell: (i) would be able to understand, remember, and carry out multi-step instructions independently; (ii) would be able to maintain persistence and pace to remember and carry out multi-step instructions independently; (iii) would not have issues dealing with coworkers and supervisors; and (iv) would not have issues dealing with work pressure.  (Tr. 309-10).

### b.    State Agency Consultants

On November 29, 2018, Carl Tishler, PhD, evaluated Sell's mental capacity based on a review of the medical record.  (Tr. 84-86).  Dr. Tishler determined that Sell would have no limitations in understanding, remembering, or applying information and would otherwise have only mild limitations.  (Tr. 84).  On February 2, 2019, Karla Delcour, PhD, concurred with Dr. Tishler's assessment of Sell's mental capacity.  (Tr. 97-98).

### D.    Relevant Testimonial Evidence

Sell testified at the ALJ hearing.  (Tr. 45-71).  She was let go from her job as a vending machine attendant following a conflict with her supervisor.  (Tr. 49-51).  She'd also told her employer she couldn't do her job anymore.  (Tr. 50).  Her past work consisted of refilling vending machines, which involved lifting up to 50 pounds and walking with a cart about a quarter of a mile.  (Tr. 51-53).

Sell testified she could no longer work because of her back, which would begin to hurt after prolonged standing, sitting, or walking.  (Tr. 54, 68).  Since she stopped working, her back

8

pain had improved a little, but she could no longer lift 50 pounds.  (Tr. 54-56).  At the time of the

hearing, she could lift, "[p]robably about five to ten pounds."  (Tr. 56).  She could walk a half-

hour and possibly up to an hour.  (Tr. 57).  She could sit, but she'd have to switch positions after

two hours.  *Id.*  And she could stand for up to two hours.  (Tr. 67).  She treated her back pain

with over-the-counter medication and heating pads.  (Tr. 58, 68).

Sell testified that she had depression, anxiety, and panic attacks, all of which she'd had

since 1999.  (Tr. 60).  She also "never" slept, and her mind would just run and wander.  (Tr. 61).

She treated her mental impairments with medication, though she still got panic attacks

occasionally.  (Tr. 61-62, 68).

Sell testified that on a typical day she stayed home, played with her dog, painted, watched

television, and completed puzzles (though she hadn't done so in a while).  (Tr. 63, 65-66).  She'd

occasionally go out to the store across from where she lived.  (Tr. 63).  And she used Facebook

every other day to speak with her granddaughter.  (Tr. 66).  Sell had volunteered at a food pantry,

but she stopped after a conflict with the supervisor.  (Tr. 63).  Sell denied having friends or going

out to restaurants and church.  (Tr. 64-65).  Sell did not like going out anymore, except to the

store and back home.  *Id.*  Sell testified that she could cook, clean, do laundry, dress, and bathe

and sometimes would trim the rose bushes.  (Tr. 66-67, 69).  But she sometimes had trouble

gripping things.  (Tr. 69).

A vocational expert ("VE"), Brett Salkin, testified that Sell's past work could be

described as vending attendant, *Dictionary of Occupational Titles* ("DOT") Code No. 319.464-

014.  (Tr. 70-71).  Under the DOT, the position was classified as work at the light exertion level

but Sell performed the job at the medium exertion level.  (Tr. 71).  The VE testified that someone

with Sell's age, education, and work experience could work as a vending attendant if they:

(i) were limited to medium work; (ii) could frequently climb ramps/stairs, stoop, kneel, crouch, and crawl; and (iii) could occasionally climb ladders/ropes/scaffolds.  (Tr. 72).  The VE also opined that a hypothetical person with the same capacity identified in the first hypothetical question could do other work available in the national economy, including the representative jobs of dishwasher, cleaner and grocery bagger.  (Tr. 72-73).  If limited to light work, the VE testified the hypothetical person could still work as a vending attendant, but only as generally performed and classified.  (Tr. 73).  The VE testified his answer would not change if the person could never climb ladders/ropes/scaffolds, could only frequently handle and finger, or could only perform simple, routine tasks with only occasional changes.  (Tr. 74-75).  If limited to sedentary work, the VE testified the individual could not work as a vending attendant.  (Tr. 73).

## III.    Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it

10

is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

## B.    Separation of Powers

Sell argues that a remand is required due to the Commissioner's unconstitutional exercise of authority.  ECF Doc. 14 at 7-9.  She argues that the SSA and the Consumer Financial Protection Bureau ("CFPB") have the same structure for the removal of their directors; thus, the Supreme Court's ruling in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) (hereafter "*Seila Law*") – which found the statute for the CFPB director's removal violated the principle of separation of powers – applies to the SSA.  ECF Doc. 14 at 7-8. According to Sell, because the ALJ operated under authority delegated to her by the

Commissioner, who in turn was unconstitutionally exercising his authority, Sell was "deprived … of a valid administrative process." *Id.*  Sell argues that her application was further harmed as it was made under regulations promulgated by the Commissioner, who lacked the lawful authority to do so.  ECF Doc. 14 at 8.  Sell contends that the separation of powers violation resulted in a "presumptively inaccurate legal standard" being utilized to decide her application. *Id.*

The Commissioner concedes that the removal provisions governing the SSA Commissioner's office violated the principle of separation of powers but contends that the constitutional error is harmless because the violation did not cause Sell any actual harm.  ECF Doc. 17 at 5-6.  Relying on *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Commissioner argues that the violation did not harm Sell because the ALJ's appointment was ratified by an acting Commissioner not subject to the removal provision at issue and, thus, the removal issue did not void the ALJ's actions.  ECF Doc. 17 at 7-9.  Further, the Commissioner argues that Sell failed to establish a nexus between the removal provision and any harm she suffered; and she asserts, as in *Collins*, the unlawfulness of a removal provision did not strip those appointed of their authority.  ECF Doc. 17 at 9-12.  Moreover, the Commissioner argues that the separation of powers violation was harmless based on the harmless error doctrine, the *de facto* officer doctrine, the Rule of Necessity, and prudential considerations.  ECF Doc. 17 at 12-17.

Sell replies that the court need not reach the constitutional issue as there are other grounds for remand but contends that she did demonstrate an injury from the Commissioner's conduct.  ECF Doc. 19 at 1-5.  Specifically, she argues that she was injured from: (i) the Commissioner's changes to HALLEX rules for how decisions were written; (ii) changes to the policies regarding the evaluation of musculoskeletal impairments; and (iii) the deprivation of a

constitutionally valid hearing, adjudication, and decision.  ECF Doc. 19 at 2-5.  She also asserts that, because the Commissioner did not contest her standing, she "had standing to raise this issue."  ECF Doc. 19 at 2.  Further, she argues that the doctrines the Commissioner cited to support the violation's harmlessness did not apply.  ECF Doc. 19 at 5-6.

In *Collins*, the Supreme Court reviewed the constitutionality of the Federal Housing Financial Agency's removal structure for its directors, which prohibited the president from removing the directors except "for cause."  141 S. Ct. at 1783.  The Court held that the limitation on the president's removal authority over a federal executive branch agency director violated the principle of separation of powers.  *Id.* at 1783.  In doing so, the Supreme Court relied on its prior precedent in *Seila Law*.  *Id.*  In *Seila Law*, the Court held that the CFPB removal structure, which limited the removal of the CFPB Director by the president only to instances of "inefficiency, neglect of duty, or malfeasance of office," violated the separation of powers between Congress and the Executive Branch.  *Id.* at 2197.

Before we address the merits of Brunton's constitutional argument, the court has an obligation to ensure it has jurisdiction.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).  Regardless of whether the parties raise or have disclaimed the issue, the court must ensure the parties have standing to raise the issue.  *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019) ("One essential aspect of this [jurisdiction] requirement is that any person invoking the power of a federal court must demonstrate standing to do so" (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)).

The standing requirement enforces the Constitution's limitation that the Judicial Branch may only decide "Cases" and "Controversies."  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992).  To demonstrate standing, a plaintiff must show that he has suffered an "injury

in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Id.* at 560-561 (internal alterations removed).

I find that Sell has failed to establish "an injury in fact" arising from the Commissioner's work while he was subject to an allegedly unconstitutional removal statute. An "injury in fact" must be more than an abstract asserted harm and must be an "invasion of a legally protected interest" that is: (i) concrete; (ii) particularized; and (iii) actual or imminent. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). Sell initially asserts only that the alleged separation of powers issue contaminated the administrative process by which a decision was reached on her claim and that a "presumptively inaccurate" legal standard was used. However, she cites no authority for her presumption. In her reply, Sell attempts to bolster her asserted injury by contending that the Commissioner's policy changes on how ALJ decisions were written and the modification of the musculoskeletal listing of impairments harmed her. But Sell's contentions fail in one significant way – she never argues that these issues affected the decision on *her* claim. Sell bases her argument that she was deprived of a valid administrative process on the separation of powers issue. *See* ECF Doc. 14 at 8. She never demonstrates that *because* of the separation of powers violation the ALJ in her case applied a legal standard the president might have disagreed with, or that a different Commissioner might have altered. And Sell's other claimed harms are similarly flawed. She makes no argument that the changes in the musculoskeletal listing somehow adversely affected her ability to prove her disability or that the changes in how ALJ decisions were written created a due process issue.

Absent some argument demonstrating a personal connection between those changes and the decision on her claim, Sell asks this court to base its jurisdiction on a generalized grievance. And this has long been insufficient to constitute a "Case" or "Controversy." *See Lujan*, 504 U.S.

14

at 560 n.1 (holding that for an injury to be "particularized" the complained of conduct must have affected the plaintiff "in a personal and individual way"); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (holding that harm which affected the plaintiff and every citizen's interest in the proper application of the constitution and laws, and relief that did not tangibly benefit him more than other citizens was not a case or controversy).

Because Sell has not alleged a particularized injury stemming from the asserted separation of powers violation, she has failed to meet her burden of establishing standing. *Va. House of Delegates*, 139 S. Ct. at 1950.  And the court must not, therefore, consider the merits of her constitutional challenge to the SSA.

### C.    Step Three

Sell argues that the ALJ failed to apply proper legal standards when the ALJ failed to articulate a basis for concluding that she did not meet a listed impairment.  ECF Doc. 14 at 10. Sell further argues that the ALJ failed to consider the MRI evidence and documented findings regarding her hand arthritis and numbness.  ECF Doc. 14 at 10-11.

The Commissioner responds that Sell has forfeited her challenge to the ALJ's Step Three findings by offering an undeveloped argument.  ECF Doc. 17 at 17-18.  Alternatively, the Commissioner argues that the ALJ complied with the regulations when she stated that she considered Listings "1.02," 12.04, and 12.06, found that no physician indicated findings that would satisfy the criteria for any listed impairment, and noted that her findings were consistent with those of the state agency consultants.  ECF Doc. 17 at 18.  The Commissioner further argues that substantial evidence supported the ALJ's conclusion that Sell did not meet Listing "1.02."  ECF Doc. 17 at 18-20.

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing."). In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).

### 1.    Listings 12.04 and 12.06

The ALJ applied proper legal standards in her evaluation of whether Sell's impairments met the criteria for Listings 12.04 and 12.06. 42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241. For both Listings, the ALJ had to determine whether Sell's mental health impairments satisfied the severity requirements of the Paragraph B criteria. *Compare* 20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.04B, *with id.* § 12.06B. Specifically, the ALJ had determine whether Sell's depressive or anxiety related disorders caused extreme limitation in one or marked limitation in two areas of mental functioning; Sell's ability to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage herself. 20 C.F.R. pt. 404, Supt. P., App. 1 §§ 12.04B, 12.06B.

16

An analysis of the Paragraph B criteria isn't present in the ALJ's discussion of her Step Three findings.  (Tr. 14).  But it *is* present in the ALJ's discussion of her Step Two findings.  The ALJ analyzed each of the four areas of mental functioning listed in Paragraph B and determined that, because Sell had no limitations in her ability to understand, remember, or apply information and otherwise had only mild limitations, her depression and anxiety impairments were nonsevere.  (Tr. 12-14).  And in doing so, the ALJ specified what evidence she relied on to make her Paragraph B findings.  *Id.*  That the ALJ did so in making her Step Two findings as opposed to Step Three does not constitute harmful error.  *Labit v. Comm'r of Soc. Sec.*, No. 1:16-cv-488, 2018 U.S. Dist. LEXIS 12190, at *11 (E.D. Tenn. Jan. 25, 2018).  Thus, I find that the ALJ sufficiently articulated her reasons for determining that Sell's mental impairments did not meet Listings 12.04 and 12.06.  *See Reynolds*, 424 F. App'x at 416.  In making our evaluation, we are not to find error unless the ALJ to makes her findings at each step of the sequential evaluation in discrete, tidy paragraphs.  Instead, we are required to evaluation the ALJ's decision as a whole and with common sense.  *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010); *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-66 (6th Cir. 2014) (looking to the ALJ's other findings to support his conclusion at Step Three).

Other than contesting the adequacy of the ALJ's explanation for her Step Three findings, Sell has not argued for how or pointed to evidence supporting a claim that she meets or medically equals the criteria for Listings 12.04 or Listing 12.06.  *See* ECF Doc. 14 at 9-10; ECF Doc. 19 at 1-2.  As the party with the burden of proof at Step Three, it was incumbent upon Sell to "point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the [L]isting."  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432

17

(6th Cir. 2014).  Because she hasn't done so, Sell's challenge to the ALJ's analysis of Listings

12.04 and 12.6 has not established a basis for remand.  *Id.*; *Forrest*, 591 F. App'x at 366.

### 2. Listing 1.04

Under the regulatory framework existing at the time of the ALJ's decision, Listing 1.04

was used to determine whether a claimant's spine disorder "result[s] in compromise of a nerve

root . . . or the spinal cord," with:

> A. Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by sensory or
> reflex loss, and if there is involvement of the lower back, positive straight-leg
> raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of
> tissue biopsy, or by appropriate medically acceptable imaging, manifested by
> severe burning or painful dysesthesia, resulting in the need for changes in position
> or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings
> on appropriate medically acceptable imaging, manifested by chronic nonradicular
> pain and weakness, and resulting in inability to ambulate effectively, as defined in
> 1.00B2b.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04 (2019).[3]

The ALJ failed to apply proper legal standards in evaluating whether Sell had an

impairment that met Listing 1.04.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  But before I

---

[3] On December 3, 2020, the Social Security Administration revised the medical criteria for evaluating
musculoskeletal disorders.  85 FR 78164 (Dec. 3, 2020).  Under the revised Listings, Listing 1.04 has
been replaced by Listing 1.15, which has different criteria than Listing 1.04.  *Compare*, 85 FR 78164
*78179-80, *with* 20 C.F.R. pt. 404, Subpt. P., App. 1 § 1.04 (2019).  The revised Listings were effective
April 2, 2021 and were only given prospective application.  85 FR 78164 *78164.  Thus, I will apply the
regulations in effect at the time of the ALJ's decision in reviewing his Step Three determination.  *Jones v.
Comm'r of Soc. Sec.*, No. 1:17 CV 662, 2018 U.S. Dist. LEXIS 143590, at *24 (N.D. Ohio Aug. 23,
2018).

discuss that, some clarification is required. The Commissioner argues that the ALJ expressly considered Listing 1.02. ECF Doc. 17 at 18. The ALJ didn't. The ALJ considered Listing *1.04*. (Tr. 14).

> The ALJ's analysis of Listing 1.04 was limited to the following:
>
> The claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment. No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. I also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion …. Furthermore, I considered all of the listings in reach this finding, with specific emphasis on 1.04.

*Id.* Notably absent from that discussion is a comparison between the listing criteria and the evidence, any of the listing criteria, or any evidence to support the ALJ's findings. *Reynolds*, 424 F. App'x at 416. That no treating or examining physician indicated findings that would satisfy the severity requirements of a listed impairment isn't an adequate explanation when the ALJ doesn't say what criteria were not met or why. *See Taltoan v. Colvin*, No. 4:13CV2526, 2014 U.S. Dist. LEXIS 157395, at *31 (N.D. Ohio Dec. 6, 2014). And the state agency consultants, whose opinion the ALJ appeared to incorporate by way of reference, also did not explain their basis for determining that Listing 1.04 was not met. *See* (Tr. 85, 98).

An articulation error at Step Three, however, can be harmless if the claimant did not put forth sufficient evidence to demonstrate that she meets the listing criteria. *Forrest*, 591 F. App'x at 366. Listing 1.04(B) requires a specific diagnosis of spinal arachnoiditis. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04B (2019); *see also Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 530 (6th Cir. 2006). Likewise, Listing 1.04C requires a specific diagnosis of lumbar stenosis that results in pseudoclaudication. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04C (2019); *see also Works v. Colvin*, No. 13-2570, 2014 U.S. Dist. LEXIS 108084, at *20 n.4 (E.D. Mich. June 18,

2014).  Sell does not point to evidence of any such diagnoses in the record, and my independent review of the record did not reveal any.  *See generally* ECF Doc. 14; ECF Doc. 19; (Tr. 293, 443-45, 456-57).

That leaves Listing 1.04A, for which there is *some* evidentiary support for *some* of the criteria.  For example, Sell's October 13, 2014 MRI scan results state that moderate disc bulging at L5-S1 abutted and likely affected the S1 nerve root.  (Tr. 456-57).  But imaging tests during the period under adjudication do not reflect nerve root compression.  (Tr. 443-44).  There isn't any evidence of atrophy with associated muscle weakness or muscle weakness.  (Tr. 273, 276, 280, 297, 299-302, 360, 380-81, 389-90, 398, 406-07, 416, 435).  And there are no positive straight leg test results on record.  (Tr. 435).

Because Sell failed to put forward sufficient evidence to demonstrate that she met, or possibly could meet, any of the criteria for Listing 1.04, the ALJ's failure to articulate her reasons for her Step Three findings was harmless.  *See Forrest*, 591 F. App'x at 366; *see also*, *e.g.*, *Faulkner v. Comm'r of Soc. Sec.*, No. 2:20-cv-5136, 2021 U.S. Dist. LEXIS 197826, at *14 (S.D. Ohio Oct. 14, 2021); *Walden v. Comm'r of Soc. Sec.*, No. 1:19-cv-00288, 2021 U.S. Dist. LEXIS 18100, at *21-25 (E.D. Tenn. Feb. 1, 2021); *Clanton v. Comm'r of Soc. Sec.*, No. 1:14-CV-1039, 2016 U.S. Dist. LEXIS 921, at *13 (W.D. Mich. Jan. 6, 2016).

### D.    Step Four – Weighing of Opinion Evidence

Sell argues that the ALJ erred when she did not take into account Dr. Vogelgesang's opinion concerning Sell's limitations.  ECF Doc. 14 at 14-15.  She argues that contrary to the ALJ's decision, Dr. Vogelgesang provided a sufficiently clear statement of Sell's maximum functional capacity when he stated that Sell could tolerate light-to-sedentary work but would

have to avoid extensive bending or twisting and possibly repetitive actions with her hands. ECF Doc. 14 at 15.

The Commissioner disagrees. ECF Doc. 17 at 23-24.

At Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[4]. According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ failed to apply proper legal standards in her evaluation of Dr. Vogelgesang's opinion. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Dr. Vogelgesang opined that Sell: (i) "could probably tolerate light to sedentary work"; and (ii) "would have to avoid extensive bending or twisting and possibly repetitive actions with her hands." (Tr. 297). The ALJ found that Dr. Vogelgesang's opinion was of "little persuasive effect" because he did not clearly provide a statement of Sell's "maximal residual functional capacity, but rather is speculative in

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

its language." (Tr. 16).  The ALJ's reasoning could be read in one of two ways.  It could be read

to mean that the ALJ determined that Dr. Vogelgesang's consultative examination wasn't a

"medical opinion" under the regulations – a statement of what Sell could still do despite her

impairments and whether she had one or more restrictions on her ability to perform work-related

activities.  20 C.F.R. § 404.1513(a)(2).  Although rife with qualifying language, Dr. Vogelgesang

did provide a statement of what Sell could do (light or sedentary work) and whether she had any

restrictions (twisting, stooping, and hand manipulation).  20 C.F.R. § 404.1513(a)(2)(1); (Tr.

297).

The ALJ's reasoning could also be interpreted as finding that Dr. Vogelgesang's opinion

was "unsupported," in that he gave insufficient explanation to support his medical opinion.  20

C.F.R. § 404.1520c(c)(1); *see Weiss v. Comm'r of Soc. Sec.*, No. 1:19-cv-2633, 2020 U.S. Dist.

LEXIS 249372, at *26 (N.D. Ohio Oct. 16, 2020) (discussing the definition of "speculative").

But "[t]o some degree, *every* medical opinion could be considered "speculative" insofar as it

seeks to predict what a claimant might or might not be able to do."  *Weiss*, No. 1:19-cv-2633,

2020 U.S. Dist. LEXIS 249372, at *26 (emphasis in original).  The ALJ was required to explain

*how* or *why* Dr. Vogelgesang's opinion was so unclear and speculative so as to render it

unpersuasive.  *See* 20 C.F.R. § 404.1520c(b); *Fleischer*, 774 F. Supp. 2d at 877.  The ALJ also

had to explain how she considered the degree to which Dr. Vogelgesang's own objective

findings supported his opinion and the degree to which his opinion was *consistent* with other

medical and nonmedical sources.  20 C.F.R. § 404.1520c(b)-(c).  The ALJ did none of these,

rendering her analysis of Dr. Vogelgesang's opinion deficient under the regulations.  (Tr. 16).

Nevertheless, I find that the ALJ's failure to comply with the regulation's articulation

requirements was harmless.  *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir.

2009).  An error in an ALJ's evaluation of the opinion evidence may be harmless in one of three circumstances: (i) when the opinion was "so patently deficient that the Commissioner could not possibly credit it"; (ii) when the Commissioner made findings consistent with the opinion; or (iii) the Commissioner otherwise met the goals of the regulations by indirectly attacking the supportability or consistency of the opinion.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010).[5]

The ALJ's decision was consistent with Dr. Vogelgesang's opinion insofar as the ALJ limited Sell to work at the light exertion level and only frequent stooping.  *Compare* (Tr. 14), *with* (Tr. 297); SSR 83-10, 1983 SSR LEXIS 30, at *14.  And the VE testified that even if the hypothetical individual were restricted to frequent handling and fingering, the hypothetical individual could still perform Sell's past work, such that Sell couldn't show prejudice.  *See Bowen*, 478 F.3d at 746; (Tr. 74).  What's left is Dr. Vogelgesang's opinion that Sell should avoid extensive twisting.  (Tr. 297).  The ALJ's discussion of Sell's subjective symptom complaints did not address twisting, so the error cannot be deemed harmless by way of an indirect attack.  (Tr. 15).  But the error can be deemed harmless because Dr. Vogelgesang's opinion as to that limitation was patently deficient as he offered no explanation for those findings.  *Burgess v. Comm'r of Soc. Sec.*, No. 19-13243, 2021 U.S. Dist. LEXIS 58803, at *15 (E.D. Mich. Mar. 29, 2021); (Tr. 297); *see also Fleming v. Comm'r of Soc. Sec.*, No. 4:10-CV-25, 2011 U.S. Dist. LEXIS 81040, at *28 (E.D. Tenn. July 5, 2011).  Nor could an explanation

---

[5] While the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017 regulations.  *See Hickman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6030, 2021 U.S. Dist. LEXIS 215187, at *14 n.5 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 U.S. Dist. LEXIS 134907, at *33 n.8 (W.D. Tenn. July 20, 2021); *Burba Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 U.S. Dist. LEXIS 179252, at *12 (N.D. Ohio Sept. 29, 2020).

be inferred from Dr. Vogelgesang's objective findings, given that he observed that Sell had no difficulty getting on and off the exam table and found that she had good range of motion and normal extension and lateral rotation.  (Tr. 296-97, 301).

Because the ALJ's RFC was partly consistent with Dr. Vogelgesang's opinion and the portions the ALJ didn't credit either would not affect the outcome or could not possibly be credited, Sell failed to establish reversible error in the ALJ's evaluation of Dr. Vogelgesang's opinion.  *Wilson*, 378 F.3d at 547.  Thus, no remand is warranted based on Sell's challenge to the ALJ's evaluation of the opinion evidence.

### E.     Step Four – Subjective Symptom Complaints and RFC

Sell argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in making her RFC findings.  ECF Doc. 14 at 11-16.  Sell argues that the ALJ failed to apply proper legal standards by disregarding Sell's testimony: (i) of her lifting, standing, sitting, and walking limitations; (ii) that her back pain was worsened by physical therapy but improved with acupuncture; (iii) of depression and anxiety; and (iv) of her difficulty gripping.  ECF Doc. 14 at 12, 14.  Sell argues that the ALJ failed to consider the residual effects of her back pain on her ability to sit, stand, walk, and change positions.  ECF Doc. 14 at 12-13.  Sell further argues that the ALJ failed to give more than a boilerplate reason for discounting her subjective symptom complaints and failed to consider MRI scan results.  ECF Doc. 14 at 14-16.  And Sell argues that the determination that she could perform her past work was not supported by substantial evidence in light of evidence documenting standing, sitting, and hand limitations that would be preclusive of work at the light exertion level.  ECF Doc. 14 at 16-18.

The Commissioner responds that the ALJ properly considered Sell's subjective symptom complaints and adequately explained her reasons for discounting them. ECF Doc. 17 at 24-25. The Commissioner argues that the ALJ's analysis of opinion evidence at Step Two of the sequential evaluation process was adequate consideration of her mental health impairments. ECF Doc. 17 at 25-26. And the Commissioner argues that substantial evidence supported the ALJ's finding that Sell's statements the severity of her symptoms was inconsistent with the evidence. ECF Doc. 17 at 26. The Commissioner also argues that substantial evidence supported the ALJ's determination that Sell could perform her past work. ECF Doc. 17 at 26-28.

As stated above, at Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See*

25

*Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016).  In

evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors,

including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's

efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors

concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS

4, at *15; 20 C.F.R. § 404.1529(c)(3).

      If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state

her reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  But the ALJ

need not explicitly discuss each of the regulatory factors.  *See Renstrom v. Astrue*, 680 F.3d

1057, 1067 (8th Cir. 2012).  And although the ALJ must discuss significant evidence supporting

her decision and explain her conclusions with sufficient detail to permit meaningful review, there

is no requirement that the ALJ incorporate all the information upon which she relied into a single

tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir.

2010).

### 1.      Physical Impairments

      The ALJ applied proper legal standards in evaluating Sell's subjective symptom

complaints regarding her physical impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.

The ALJ complied with the regulations by: (i) assessing Sell's RFC in light of the medical

evidence, her testimony, and other evidence in the record; and (ii) clearly explaining that she

rejected Sell's subjective symptom complaints because her statements regarding the intensity,

persistence, and limiting effects of her symptoms were consistent with the record evidence.  20

C.F.R. § 1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3-4, 11-12, 15; SSR 96-8p, 1996 SSR

LEXIS 5, at *13-15; (Tr. 14-16).  The ALJ provided sufficiently clear reasons for rejecting Sell's

subjective symptom complaints when she stated that: (i) MRI and x-ray findings in the record arguably showed improvement in Sell's back condition over time; (ii) her symptoms were inconsistent with unremarkable physical exam findings, such as inconsistent reports of painful range of motion and no signs of muscular atrophy, "suggesting continued weight bearing activity in recent years"; and (iii) the severity of her alleged symptoms was inconsistent with her activities of daily living.  (Tr. 15).

The ALJ's first reason and part of her second reason appear to be improper medical findings.  *Scott v. Comm' of Soc. Sec.*, No. 16-11922, 2017 U.S. Dist. LEXIS 102119, at *33 (E.D. Mich. May 23, 2017) ("ALJs are not qualified to interpret raw medical data[] and may not play doctor." (quotation marks omitted)).  None of the physicians who gave an opinion concluded that the imaging evidence showed improvement in Sell's back condition or that her physical examination results showed continued weight bearing activity.  *See* (Tr. 86-88, 100-01, 294-97).  I could find no treatment note in which a treating source reviewed Sell's MRI and x-ray scans and determined that they reflected an improvement over her October 11, 2014 MRI scan or that Sell continued weight bearing activities.  Nor does a review of the imaging scans suggest improvement in Sell's back condition.  The interpreter of Sell's 2014 MRI scan stated that it showed "[l]eft paracentral disc protrusion at the L5-S1 level which abuts and likely affects the left S1 nerve root."  (Tr. 457).  The interpreter of Sell's November 19, 2019 x-ray stated it showed: (i) degenerative disc disease at L5/S1; (ii) degenerative facet disease in the lower lumbar spine; and (iii) mild levoscoliosis.  (Tr. 446).  And the interpreter of Sell's December 10, 2019 MRI stated it showed: (i) mild degenerative changes in the lumbar spine with no lumbar or neural foraminal stenosis; and (ii) interspinous bursitis at L3-L5.  (Tr. 443).  Without being a physician, one cannot conclude that it's somehow an improvement to have degenerative disc

disease, degenerative facet disease, and interspinous bursitis when compared to having paracentral disc protrusion abutting a nerve root.  Nor can one conclude that Sell's self-reported limitations on her ability to lift, stand, sit, or walk are inconsistent with imaging tests showing spinal conditions that the imaging tests themselves say could cause pain.  (Tr. 443).

Those two concerns aside, the ALJ's other reasons *were* adequate and could independently support the ALJ decision to discount Sell's physical-impairment subjective symptom complaints about her back.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Substantial evidence supported the ALJ's finding that Sell's limited range of motion was not consistently observed by physicians.  *Compare* (Tr. 297, 435 (full or good range of motion)), *with* (Tr. 380-81, 398, 416 (reduced range of motion)), *and* (Tr. 266, 273, 280, 319, 326-27, 335, 390, 407 (range of motion not mentioned)).  Substantial evidence also supported the ALJ's finding that Sell consistently exhibited negative straight leg raise test results, full muscle strength, and no indication of muscle atrophy.  (Tr. 296-97, 299-300, 435).  Substantial evidence supported the ALJ's finding that Sell's stated sitting, standing, and walking limitations were inconsistent with her activities of daily living, such as: (i) Sell's testimony that she could cook, clean, do laundry, dress, bathe, play with her dog, and trim rose bushes without limitation; (ii) Sell's statements to Dr. Dubey that she was independent in her activities of daily living; (iii) Sell's statements to SSA that she had no problems with her activities of daily living; and (iv) Sell's statements in her function report that she had no issues with her activities of daily living.  (Tr. 66-67, 69, 82, 217-20, 296, 307).  And substantial evidence supported the ALJ's finding that Sell's stated limitation in her ability to lift "probably only five to ten pounds" was inconsistent with Sell's own statements in the record.  (Tr. 295 (noting that Sell self-reported being able to lift 25 pounds)).

Sell's argument that the ALJ disregarded evidence of her physical impairments is unavailing. The ALJ expressly considered Sell's MRI results and her testimony of her lifting, standing, sitting, and walking limitations and the effects of her back pain. (Tr. 15). The ALJ didn't exhaustively summarize Sell's testimony or do a statement-by-statement assessment of her symptoms, but the ALJ didn't have to. *Day v. Comm'r of Soc. Sec.*, No. 1:16-cv-2813, 2017 U.S. Dist. LEXIS 208434, at *37 (N.D. Ohio Dec. 5, 2017). Sell is correct that the ALJ didn't address her testimony or evidence concerning her stated hand limitations, but the harm she claims is that it affected her ability to lift – which the ALJ *did* address. And there are no objective findings on record that substantiate Sell's claim that her arthritis and hand numbness caused *any* functional limitations. *See* (Tr. 86-88, 100-01, 272-73, 275-76, 279-80, 297, 299-301, 335, 360, 378-81, 388-90, 396-98, 405-07, 414, 416, 433-35); *see also* (Tr. 350-51 (opinion from Dr. Crombie in which he declined to find any functional limitations)).

Although not perfect, the ALJ's evaluation of Sell's subjective symptom complaints of her physical impairments was supported by substantial evidence. *Mullen*, 800 F.2d at 545. And any procedural errors the ALJ committed by way of improper medical findings and omission of Sell's hand limitations were harmless. *Bowen*, 478 F.3d at 746. Thus, I find no basis for remand on account of Sell's challenge to the ALJ's evaluation of her physical impairments at Step Four.

## 2. Mental Impairments

The ALJ failed to apply proper legal standards in evaluating Sell's subjective symptom complaints regarding her mental health impairments. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. As Sell correctly points out, the ALJ did not mention at Step Four her consideration, if any, of Sell's nonsevere impairments of depression and anxiety. SSR 96-8p, 1996 SSR LEXIS 5, at *14-15. The ALJ's Step Four discussion of Sell's subjective symptom complaints only

mentioned her musculoskeletal symptoms.  (Tr. 14-16).  There was no mention or discussion of Sell's depression and anxiety diagnoses or her mental health treatment.  *See id.*  Instead, the ALJ indicated in addressing mental impairments at Step Two that the RFC "reflects the degree of limitation I have found in the 'paragraph B' mental function analysis." (Tr. 14).  The problem with that statement is that "the limitations identified in the 'paragraph B' … criteria are *not* an RFC assessment but are used to rate the severity of mental impairments(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 SSR LEXIS 5, at *13 (emphasis added).  The ALJ was required to go further and conduct a "detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C." *Id.*  By arguably incorporating by reference her Paragraph B findings as part of the RFC assessment, the ALJ erroneously conflated the distinct steps of the sequential evaluation process.  *Garcia v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 805, 811 (S.D. Ohio 2015); *see Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009) (holding that the ALJ erred in basing his mental RFC assessment at Step Four solely upon his severity evaluation at Step Two).

Moreover, the ALJ's Step Two discussion stated: "[t]he limitations identified in the "paragraph B" criteria are *not* a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process *requires a more detailed assessment*.  (Tr. 14, emphasis added).  As discussed below, that "more detailed assessment" was never discussed.  Instead, the ALJ apparently asks the reader of her decision to take the ALJ's word for it that "the following functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental functional analysis.  Nothing

in the regulations requires either Sell or this court to take the ALJ's word for it that the required "more detailed assessment" was actually performed.

The ALJ's omission is compounded by the fact that she found mild limitations in three of the four areas analyzed at Step Two yet never explained why this did not result in any limitations in the RFC.  (Tr. 13).  The ALJ was not required to include mental limitations in Sell's RFC, but she was required to state the basis for concluding that none of the mild limitations resulting from Sell's depression and anxiety resulted in any work-related restrictions, either singly or in combination with her other impairments.  SSR 96-8p, 1996 SSR LEXIS 5, at *5; *Andrews v. Comm'r of Soc. Sec.*, No. 5:20-cv-1512, 2021 U.S. Dist. LEXIS 144698, at *51 (N.D. Ohio July 14, 2021).

Although the ALJ found persuasive the state agency consultants' opinion regarding Sell's mental health impairments, their opinion was only that Sell's anxiety and depression were nonsevere because the Paragraph B criteria were not satisfied.  (Tr. 13-14).  And although the ALJ found persuasive Dr. Dubey's opinion, Dr. Dubey found that Sell had *no* functional limitations.  But the ALJ – in a finding that worked to Sell's advantage – found mild limitations in three areas of mental functioning.  (Tr. 13, 309-10).  That was a conflict that the ALJ was required to resolve but didn't.  SSR 98-6p, 1996 SSR LEXIS 5, at *20.  The ALJ's evaluation of the opinion evidence did not explain why no functional limitations related to Sell's depression and anxiety were included in the RFC despite finding that she had mild limitations.  It could be that the ALJ did conduct the appropriate analysis and may have been justified in omitting such limitations.  But, again, we cannot know because the matter was not discussed in the context of the ALJ's "more detailed" Step Four analysis.

The error was not harmless.  The ALJ's decision failed to build an accurate and logical bridge between the ALJ's finding that Sell's anxiety and depression caused her to have mild mental functioning limitations and the ALJ's RFC, which included no mental health impairment limitations.  *Fleischer*, 774 F. Supp. 2d at 877.  The ALJ did not include hypotheticals to the VE that had any nonexertional mental health limitations.  It may well be that the ALJ's Step Two findings also would have supported a determination that Sell's mild limitations did not restrict work activity.  But the ALJ was the one who found mild limitations in the first place and it's up to the ALJ to explain how her own findings impacted the RFC.  *Andrews*, No. 5:20-cv-1512, 2021 U.S. Dist. LEXIS 144698, at *53.

Because the ALJ failed to apply proper legal standards in her evaluation of Sell's subjective symptom complaints, I recommend that the ALJ's decision be vacated and the matter be remanded so that the ALJ can explain the decision not to include any mental limitations in the RFC.  *Id.*  And because a reassessment of Sell's mental RFC will likely impact the ALJ's determination of whether can perform her past work, the court need not address Sell's remaining challenge to that finding.

## IV.    Recommendation

Sell lacks standing to raise her constitutional challenge.  But because the ALJ failed to apply proper legal standards in her evaluation of Sell's mental health subjective symptom complaints, I recommend that the Commissioner's final decision denying Sell's application for DIB be vacated and that Sell's case be remanded for further consideration.


Dated: January 6, 2022

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, \*6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).